Deborah ANDERSON, et al., Plaintiffs,

v.

ROCHESTER–GENESEE REGIONAL
TRANSPORTATION AUTHORITY,
et al., Defendants.

No. 00–CV–6275L.

United States District Court,
W.D. New York.

Aug. 14, 2001.

David L. Cook, Nixon Peabody LLP, Rochester, NY, Bryan D. Hetherington, Rochester, NY, Sarah J. Gilmour, Rochester, NY, Peter O'Brian Dellinger, Rochester, NY, for plaintiffs.

Paul J. Yesawich, III, Scott D. Piper, Harris Beach LLP, Pittsford, NY, for defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

This is an action against the Rochester–Genesee Regional Transportation Authority ("RGRTA"), as well as a corporate subsidiary of RGRTA, Lift–Line, Inc., and two individual officers of those entities, alleging that defendants have systematically violated the Americans with Disabilities Act ("ADA" or "the Act"), 42 U.S.C. § 12101 *et seq.*, because they have failed to provide the necessary transportation services to the disabled that are comparable to the services provided to the greater public. Although it appears that defendants' efforts in this regard have been well-intentioned, the record nevertheless demonstrates that those efforts have fallen short of what is required under the ADA and related federal regulations. Defendants can and must do better. The current system clearly discriminates against individuals with disabilities, and it must be rectified.

The action was commenced by twelve individual plaintiffs and the Center for Disability Rights ("CDR"), alleging claims under the ADA and 42 U.S.C. § 1983. The individual plaintiffs, all of whom are disabled within the meaning of the ADA, seek to enforce their right to comparable service, referred to as "paratransit services" under the Act. Paratransit services are defined by regulations promulgated by the Secretary of Transportation ("the Secretary") as "comparable transportation service required by the ADA for individuals with disabilities who are unable to use fixed route transportation systems." 49 C.F.R. § 37.3.

The complaint names four defendants: RGRTA and its Chief Executive Officer, Donald Riley; and Lift Line, Inc., and its director, Debie Himmelsbach. RGRTA is a state-created entity providing public transportation services in the Rochester, New York area. Lift Line is a wholly-owned subsidiary of RGRTA that provides paratransit services within the geographical area served by RGRTA. Plaintiffs allege that defendants have violated the ADA in a number of respects, all of which relate in some way to not proving adequate paratransit services. Plaintiffs request declaratory and injunctive relief.

Defendants, who have not yet answered the complaint, have moved for summary judgment. In short, they claim that the undisputed evidence shows that they are in compliance with the ADA.

Plaintiffs have cross-moved for summary judgment on three of their four claims for relief, or in the alternative for a preliminary injunction.

### STATUTORY AND REGULATORY FRAMEWORK

In order to understand and consider plaintiffs' allegations and claims, some familiarity with the relevant statutes and regulations is necessary. The particular statutory provisions at issue in this case are part of the ADA, which was enacted in 1990 to remedy various shortcomings in the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See Helen L. v. DiDario,* 46 F.3d 325, 330–31 (3d Cir.) (examining history of the two acts, and noting that Rehabilitation Act's weaknesses in-

clude, *inter alia,* limited coverage and inadequate enforcement mechanisms), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).

Finding the then-existing laws to be "inadequate" to combat "the pervasive problems of discrimination that people with disabilities are facing," S.Rep. No. 116, 101st Cong., 1st Sess. 18 (1989); H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 47 (1990), Congress recognized a need for "omnibus civil rights legislation" that would "finally set in place the necessary civil rights protections for people with disabilities." S.Rep. No. 116, 101st Cong., 1st Sess. 19 (1989); H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 40 (1990). In reaching that determination, Congress concluded:

> [T]here is a compelling need to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and for the integration of persons with disabilities into the economic and social mainstream of American life. Further, there is a need to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.

S.Rep. No. 116, 20; H.R.Rep. No. 485(II), 50. *See also* 42 U.S.C. § 12101(b) (listing among the purposes of ADA Congress's intent "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities").

Congress's findings and intentions in this regard extended to many aspects of American life, transportation among them. The Act itself sets forth Congress's finding that discrimination against individuals with disabilities persisted in a number of "critical areas," including transportation. 42 U.S.C. § 12101(a)(3).

The legislative history of the ADA indicates that transportation was in fact an area of particular concern to Congress in passing the Act. The House Committee on Education and Labor, for example, described transportation as "the linchpin which enables people with disabilities to be integrated and main-

streamed into society." H.R.Rep. No. 485(II) at 37, (1990), reprinted in 1990 U.S.C.C.A.N. 303, 319. Similarly, the House Committee on Energy and Commerce stated that transportation "is a veritable lifeline to the economic and social benefits that our Nation offers its citizens ... For this reason, the National Council on Disability has declared that 'accessible transportation is a critical component of a national policy that promotes self-reliance and self-sufficiency of people with disabilities.'" H.R.Rep. No. 485(IV) at 25, (1990), reprinted in 1990 U.S.C.C.A.N. 512, 514.

Plainly, then, Congress firmly intended to see to it that the disabled be free from discrimination in the area of transportation, in order to enable them to be fully integrated into the fabric of society at all levels. It is against this backdrop that the court must examine the particular provisions at issue in the case at bar.

Section 12143(a) of Title 42 requires any public entity that maintains a public transit system to provide "paratransit and other special transportation services to individuals with disabilities ... that are sufficient to provide to such individuals a level of service (1) which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system; or (2) in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system."

Section 12143(c)(7) requires the public entity annually to submit to the Secretary a plan for providing paratransit services which meet the requirements of the Act. Federal regulations promulgated by the Secretary pursuant to 42 U.S.C. § 12134 permit the entity, once it has submitted a plan, to submit an annual certification of continued compliance in lieu of a full-blown updated plan. 49 C.F.R. § 37.135(c)(1).

The regulations also contain certain provisions concerning responses to requests for service, and in particular the timing of service following a request. These provisions are of central importance to the case at bar:

(b) Response time. The entity shall schedule and provide paratransit service to any ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day. Reservations may be taken by reservation agents or by mechanical means.

(1) The entity shall make reservation service available during at least all normal business hours of the entity's administrative offices, as well as during times, comparable to normal business hours, on a day when the entity's offices are not open before a service day.

(2) The entity may negotiate pickup times with the individual, but the entity shall not require an ADA paratransit eligible individual to schedule a trip to begin more than one hour before or after the individual's desired departure time.

(3) The entity may use real-time scheduling in providing complementary paratransit service.

(4) The entity may permit advance reservations to be made up to 14 days in advance of an ADA paratransit eligible individual's desired trips. When an entity proposes to change its reservations system, it shall comply with the public participation requirements equivalent to those of § 37.131(b) and (c).

49 C.F.R. § 37.131(b).

In addition, the regulations place certain restrictions on the ability of a public entity to limit the availability of paratransit service, and the acceptable reasons why it may deny such service:

(f) Capacity constraints. The entity shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals by any of the following:

(1) Restrictions on the number of trips an individual will be provided;

(2) Waiting lists for access to the service; or

(3) Any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons.

(i) Such patterns or practices include, but are not limited to, the following:

(A) Substantial numbers of significantly untimely pickups for initial or return trips;

(B) Substantial numbers of trip denials or missed trips;

(C) Substantial numbers of trips with excessive trip lengths.

(ii) Operational problems attributable to causes beyond the control of the entity (including, but not limited to, weather or traffic conditions affecting all vehicular traffic that were not anticipated at the time a trip was scheduled) shall not be a basis for determining that such a pattern or practice exists.

49 C.F.R. § 37.131(f).

## FACTUAL BACKGROUND

The complaint alleges that each of the individual plaintiffs is disabled and is dependent on Lift Line for transportation. Plaintiff CDR is a non-profit organization that advocates on behalf of and provides services to persons with disabilities. Many of CDR's employees are themselves disabled.

Defendant RGRTA is a public benefit corporation, a public authority created by New York statute to provide and foster mass transit and public transportation services in the Rochester, New York area. *See* N.Y. Pub. Auth. L. §§ 1299–aa to 1299xx. As such, RGRTA is a "public entity" for purposes of the ADA. *See* 42 U.S.C. § 12131(1)(B) (defining "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government").

Pursuant to its statutory authority, RGRTA has created several subsidiary corporations, including defendant Lift Line, Inc. and Regional Transit Service, Inc. ("RTS"), as public benefit corporations. RTS operates bus lines on a "fixed route system" as that term is defined in 42 U.S.C. § 12141(3), *i.e.*, "a system of providing designated public transportation on which a vehicle is operated along a prescribed route according to a fixed schedule."

As a complement to that fixed route system, RGRTA, through Lift Line, operates a

paratransit system in Rochester, New York. Pursuant to its obligations under federal regulations, Lift Line, which has a fleet of thirty-six buses, *see* Affidavit of Donald Riley (Docket Item 4) ¶ 7, provides curb-to-curb transportation from origins, and to destinations, along a corridor with a width of three quarters of a mile on each side of each fixed route operated by RTS. *See* 49 C.F.R. § 37.131(a). Persons must submit an application, including a completed questionnaire and certification by a health care professional concerning their disability, and be certified by Lift Line before they are eligible to use Lift Line's services. *See* Defendants' Statement of Undisputed Facts Ex. 2. Currently, about 6200 persons are certified to use Lift Line.

Plaintiffs allege various deficiencies in the services provided by Lift Line, particularly with respect to its provision of "next-day" service, *i.e.*, rides provided the day after a ride request is made, as required by 49 C.F.R. § 37.131(b). The complaint alleges, for example, a number of occasions on which a plaintiff called Lift Line to schedule a ride, from one to several days in advance, and was told that Lift Line was unable to fulfill the request due to capacity constraints. Plaintiffs contend that the reason for this is that defendants simply refuse to put enough vehicles in service to make rides available for all eligible users.

Plaintiffs allege that defendants encourage riders to schedule rides as far in advance as possible within the fourteen-day period prescribed by § 37.131(b)(4), and that as one gets closer to the requested ride date, the percentage of ride denials escalates sharply. The record, including data submitted by defendants themselves, supports this allegation.

Defendants' figures show that although typically around 95% of all ride requests made within the entire fourteen-day period are granted, Riley Aff. ¶ 42, that figure does not tell the whole story, because the likelihood that a particular request will be granted depends heavily on how far in advance the request is made. From May 26 to June 14, 2000, for example, Lift Line received 8962 ride requests. Nearly three quarters of those requests, 6668 or 74.4% to be exact,

were for rides fourteen days in advance of the request. Defendants' Ex. 3. The remaining 25% of the requests are spread out fairly evenly over the other thirteen days within which requests are accepted.

Of those 6668 fourteen-day advance requests, 6637 (99.54%) were granted. Of the 380 requests made thirteen days in advance, 356 (93.68%) were granted. In other words, even by day 13, the percentage of requests fulfilled dropped below the overall 95% rate upon which defendants rely here.

The figure continues to drop, gradually at first, over the course of the fourteen-day period, until it reaches only 62.78% for requests made on two days' notice. It then plummets to just 42.86% for requests made for rides the following day. A rider seeking next-day service, then, has well under a 50% chance of his request being granted. *Id.*

Plaintiffs also allege that defendants require persons requesting rides to call back to "confirm" that a ride is available, but that in fact this practice is not a "confirmation" system at all. According to plaintiffs, on the initial call, a ride is only tentatively scheduled, subject to space being available, and the "confirmation" call is to determine whether such space is in fact available. That practice, plaintiffs allege, amounts to a "waiting list" that is prohibited by law.

Based on these allegations, plaintiffs assert four claims for relief. The first alleges that defendants have failed to provide next-day paratransit services in violation of 42 U.S.C. § 12143(a)(2) and 49 C.F.R. § 37.121(b). The second claim alleges that defendants have maintained waiting lists for paratransit service, in violation of 49 C.F.R. § 37.131(f)(2).

Plaintiffs' third claim for relief alleges that, by maintaining waiting lists, providing transportation only on a "first come, first served" basis, and failing to provide next-day service, defendants have engaged in an operational pattern or practice that significantly limits the availability of paratransit services to plaintiffs, in violation of 49 C.F.R. § 37.131(f)(3). The fourth claim alleges that defendants have failed to provide paratransit services in accordance with their paratransit

plan submitted to the Secretary, in violation of 42 U.S.C. § 12143(e)(4).

The individual plaintiffs allege that these violations have caused them harm by limiting plaintiffs' access to transportation services, making it difficult or impossible for plaintiffs to take certain needed trips around Rochester, and thereby interfering with their engaging in ordinary life activities.

CDR is alleged to be aggrieved by defendants' violations in various ways, such as causing CDR to spend time and effort dealing with the problems engendered by defendants' actions, and because CDR staff members are often unable to travel to CDR meetings, programs, and other activities.

## PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### I. Summary Judgment—General Standards

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and all ambiguities and inferences that may be reasonably drawn from the facts must be viewed in the light most favorable to the non-moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). To defeat a motion for summary judgment, the non-moving party must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ On a motion for summary judgment, then, the court is charged with the duty of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). To put it another way, "[o]n a motion for summary judgment, a court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36–37 (2d Cir.1994) (quoting *Donahue v. Windsor Locks Bd. of Fire Comm.*, 834 F.2d 54, 58 (2d Cir.1987)).

■ In the case at bar, both sides have moved for summary judgment. Although that fact does not necessarily mean that either of them is entitled to summary judgment, *see, e.g., BBS Power Mod, Inc. v. Prestolite Elec., Inc.*, 71 F.Supp.2d 194, 202 (W.D.N.Y.1999) (denying cross-motions for summary judgment on ground that genuine issues of material fact existed), it does appear that the relevant facts here are largely undisputed. In particular, defendants do not deny that Lift Line has historically fulfilled less than half of all requests for next-day rides. In fact, in support of their motion, plaintiffs rely on the figures supplied by defendants themselves.

What is at issue in this case, then, is not whether, or to what extent, defendants fulfill or deny ride requests, but whether their performance in that regard satisfies the mandates of the ADA. Based upon the undisputed facts before me, and the applicable statutes and regulations governing paratransit service, I conclude that defendants have violated the ADA, and that plaintiffs are entitled to summary judgment.

### II. Next–Day Service

Plaintiffs' first claim for relief alleges that defendants have violated the ADA by failing to provide paratransit service to plaintiffs on a particular day in response to a request for service made the previous day. Defendants do not deny that they have failed to provide such next-day service, but contend that they are in compliance with their obligations under the ADA.

■ In support of that contention, defendants argue that § 37.131(b) does not require that 100% of next-day requests be granted. They maintain that the provision in 42 U.S.C. § 12143(a) that "in the case of response time," paratransit service must be "compara-

ble, to the extent practicable," to transportation service provided to persons without disabilities, acts as a limitation on the next-day requirement. According to defendants, § 37.131(b) requires only that the entity provide "some level" of next-day service. Defendants' Reply Memorandum at 4.

■ The problem with defendants' argument is that it is flatly contradicted by the language of the regulations themselves, which must be given substantial deference by the court. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations.... [T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (citations omitted).

Section 37.131(b) is quite clear: "The entity *shall* schedule and *provide* paratransit service to *any* ADA paratransit eligible person at *any* requested time on a particular day in response to a request for service made the previous day." Nothing about that language suggests that it is enough for the entity only to provide "some level" of next-day service.

Defendants also note the provision in § 37.131(f)(3)(i)(B) that prohibits any "operational pattern or practice" that results in "[s]ubstantial numbers of trip denials or missed trips." According to defendants, this too permits requests for next-day service to be denied, as long as the number of denials is not "substantial."

I am not persuaded by this argument. This provision does not state that a public entity *may* deny ride requests as long as the number of denials is not "substantial." It simply provides a prohibition separate and distinct from the next-day requirement contained in § 37.131(b). There is no reason to think that either of these subsections modifies or limits the other, nor do I see any inconsistency between them.

■ Furthermore, even if defendants' interpretation of these regulations were correct, their actions would still run afoul of those regulations. By defendants' own ad-

mission, they have generally granted *less than half* of all requests for next-day service. By any reasonable view, a 57% denial rate is certainly "substantial."

Defendants attempt to avoid grappling with that damning statistic head-on by focusing instead on their 95% overall request fulfillment rate, *i.e.*, the rate for all requests made up to 14 days in advance. This argument is specious. As noted above, the rosy picture presented by that figure hides a far bleaker one when one considers ride requests made on shorter notice, and particularly the dismal 43% fulfillment rate for requests for next-day service.

As stated, the regulations very clearly require the public entity to provide service to *any* eligible person on a particular day in response to a request made the previous day. To find that defendants are in compliance with their obligations merely because most requests made up to 14 days in advance are granted would render the next-day requirement virtually meaningless.

The simple fact is that defendants have not even come close to meeting their obligation to provide next-day service, and even granting 100% of all 14–day, or even 2–day, requests cannot alter that fact. When circumstances dictate that a patron obtain a ride the following day, it will provide small comfort, when the patron's request is denied, as it more likely than not will be, to know that had he had the prescience to have foreseen his need two weeks earlier, he would have been virtually assured of getting a ride. A system that in practice encourages patrons to schedule rides 14 days ahead of time is in no way comparable, even "to the extent practicable," to the level of service provided to persons without disabilities using a fixed-route system.

This conclusion finds support in what appears to be the only reported decision in this area to date. In *Liberty Resources, Inc. v. Southeastern Pennsylvania Transp. Auth.*, 155 F.Supp.2d 242 (E.D.Pa.2001), the court granted summary judgment on the issue of liability for the plaintiffs on their ADA claim against the defendant (known by the acronym "Septa"), a paratransit service provider,

finding that the defendant had violated the ADA "by failing to provide next-day service to all ADA-eligible patrons and constraining paratransit service by operating in a pattern or practice that significantly limit[ed] the availability of rides to ADA-eligible patrons by issuing a substantial number of trip denials and operating a system that fail[ed] to attempt to provide rides to all disabled riders." 155 F.Supp.2d at 259.

In *Liberty Resources*, the data showed that over a 13–month period, 2.8% of all trip requests were denied due to lack of capacity, and 13.4% of next-day requests resulted in such capacity trip denials. In reaching its conclusion that this amounted to a violation of the ADA, the court stated that the language in § 37.131(b) concerning next-day service "indicate[s] that DOT [the Department of Transportation] expected agencies such as Septa to *attempt* to provide properly requested rides to *all* ADA-eligible riders, i.e., without exception." *Id.* at 255 (emphasis in original).

The court also pointed out that "DOT explicitly rejected incorporating a 98 percent performance standard," *id.* (citing 56 Fed. Reg. 45584, 45608 (Sept. 6, 1991)), which "suggests that DOT contemplated that providing rides 98 percent of the time failed to guarantee a 'comparable' system." *Id.* In addition, the court noted that in a December 28, 1999 opinion letter written by the Chief Counsel for the Federal Transit Administration ("FTA"), Patrick W. Reilly, in response to a letter from Septa's Chief Operating Officer asking whether the ADA regulations require a public entity to provide rides to "each and every eligible patron who requests one," Reilly replied:

> those matters which the transit agency controls, such as decisions on resources for paratransit services, must be designed to meet the demand by all eligible riders, rather than some subset of total demand.... [T]he term "substantial number" ... cannot be read to allow a transit agency to make operational decisions to serve less than all eligible riders.... Operators must monitor current ADA complementary paratransit usage, acquire additional service based on projected demand, and maintain the ability to respond to surges in demand.

*Id.* at 255. The court concluded from this letter that "the 'substantial number' language cannot be used as a green light to intentionally create a system that denies rides." *Id.*

In the case at bar, defendants attempt both to distinguish *Liberty Resources* on its facts, and to show that there are flaws in the reasoning of that decision, but I am persuaded by neither of these arguments. Rather, I agree with the district court in that case that the language of the regulations themselves plainly requires that all requests for next-day paratransit service be granted, and that this conclusion is reinforced by the DOT's own actions and interpretation of the regulations.

This conclusion is also consistent with Congress's overall purpose in enacting the ADA, and in particular those provisions dealing with public transportation. As stated, in passing the ADA, Congress sought "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). Those purposes were based in part upon Congress's finding that discrimination against individuals with disabilities persisted in a number of "critical areas," including transportation, 42 U.S.C. § 12101(a)(3), which Congress described as a "linchpin" and a "lifeline" that enables people with disabilities to be integrated into society and to receive the full range of economic and social benefits that are available to all Americans. H.R.Rep. No. 485(II) at 37, (1990), reprinted in 1990 U.S.C.C.A.N. 303, 319; H.R.Rep. No. 485(IV) at 25, (1990), reprinted in 1990 U.S.C.C.A.N. 512, 514.

These statements all bespeak Congress's intention to put into place strong standards to ensure that persons with disabilities would have access to public transportation that is truly comparable to that available to nondisabled users of fixed-route systems. The requirement that all requests for next-day service be met is in furtherance of that goal.

This becomes apparent when one considers the manner in which fixed-route and paratransit systems operate. As the court in *Liberty Resources* pointed out, because of certain basic differences between fixed-route and paratransit systems, "comparing these systems is like comparing apples and oranges ...." 155 F.Supp.2d at 256. By their nature, fixed-route systems provide regularly scheduled service along fixed routes. Since the total demand for paratransit service is much lower than that for fixed-route service,[1] it would not be practicable, or necessary, to provide paratransit service in the same manner or on the same scale as fixed-route systems; vehicles would frequently be running completely or nearly empty. It would seem to be *less* burdensome, then, and more practicable, to provide rides only as needed and upon request of the rider.

As stated, this results in a system that is qualitatively different from a fixed-route system, since trips are not made according to a fixed schedule along a fixed route, irrespective of actual demand, but in response to individual ride requests. Although it therefore can never literally be the *same* as a fixed-route system, by law, that paratransit system must provide service that is "comparable" to that provided to nondisabled persons by the fixed-route system, and with respect to response time, "comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system." 42 U.S.C. § 12143(a).

On a fixed-route system, of course, riders need not schedule a ride in advance; they know that, if they show up at a designated stop at a certain time, barring unforeseen problems such as mechanical breakdowns or traffic jams, a bus will arrive shortly. Occasionally that bus may be filled to capacity and the rider will be unable to board, but that typically would happen during rush hour or other periods of anticipated peak demand, when buses run more frequently, so that the rider would simply have to wait a relatively short period of time for the next bus to come along.

In the case at bar, however, when a ride request cannot be fulfilled due to capacity constraints, the result is not simply that the rider must make the trip a little later than he had hoped; indeed, the regulations permit the entity to schedule the trip to begin up to an hour before or after the time requested, and if that were all that was occurring, plaintiffs would have no claim. What is happening here is that eligible persons are being completely denied rides on the days requested. That is simply not "comparable" to a fixed-route system. *See Liberty Resources,* 155 F.Supp.2d at 256 (observing that unlike paratransit system capacity constraints, "a constraint on a fixed route system never results in a patron being denied a ride altogether, absent an uncontrollable force").

■ Defendants state that there are steps that they could take to alleviate their capacity problems, but they contend that these measures could have undesirable effects. For instance, defendants state that Lift Line "has historically taken an extraordinarily liberal view of who meets the certification qualifications and has denied very few applicants." Riley Aff. ¶ 11. Defendants maintain that had Lift Line used a more rigorous, but still ADA-compliant, certification process, perhaps as many as half of the applications would have been denied, as opposed to the 6.8% that were actually denied from 1992 through 1999. Riley Aff. ¶¶ 16, 17.

Defendants also state that Lift Line has declined to conduct recertification evaluations to determine the continued eligibility of previously-certified individuals, which Lift Line would be permitted to do under the regulations. 49 C.F.R. § 37.125(f). Defendants note that in other communities that have conducted such recertification procedures, certified riderships dropped by anywhere from 30% to almost 70%. Riley Aff. ¶ 18. In fact, defendants state that "Lift Line could reduce its denial rate even further, and perhaps eliminate it altogether, if it recertified the eligibility of its riders, required riders to

---

1. For example, defendant Riley states in an affidavit that RTS has a fleet of 243 buses that provide about 13.5 million rides a year. Lift Line has a fleet of 36 vehicles that provide about 142,000 rides a year.

use accessible RTS buses whenever possible, or raised fares to the statutory limit." [2] Riley Aff. ¶ 52.

According to defendants, if Lift Line were to engage in these and other measures to reduce its certified ridership, plaintiffs and others like them could actually be harmed by being denied certification altogether. While there is nothing wrong with defendants taking steps to guard against deliberate abuse of the system by nonqualified persons, the court is troubled that these assertions could be viewed as a veiled threat against plaintiffs and other similarly situated persons. The suggestion seems to be that if plaintiffs seek to enforce their rights under the ADA, the result might be that many people who are currently using Lift Line, after having been duly certified by defendants, might find themselves without access to the paratransit services which they have relied on in the past. It would be most unfortunate and improper for defendants to take radical steps to strip previously-certified riders of their certification by applying the strictest possible standards for eligibility when other steps-such as increasing capacity-are available.

I note that the ADA contains an anti-retaliation provision [3] making it unlawful for any person "to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." While the court is not implying that defendants' statements about recertification amount to a violation of this provision, defendants' suggestion that, if plaintiffs prevail in this lawsuit, defendants might in the future choose to err on the side of denying certification could have a chilling effect on persons who might wish to exercise their full panoply of rights under the ADA. Such a result would run contrary to the spirit of the Act, as well as to defendants' own laudable history of seeking to provide paratransit service to the greatest possible number of persons. It would certainly be regrettable if defendants sought to retreat from their past liberality in that regard by swinging the pendulum to the opposite extreme, administering the Lift Line program in the most exclusive, rather than inclusive, manner possible.

I also note that Lift Line receives a considerable portion of its operating budget from government funds. RGRTA's original paratransit service plan, adopted in 1992, states that "[t]he current annual budget is $1.670 million of which $1.416 million is in government aid." Defendants' Ex. 4 at 25. Although exact figures for more recent years do not appear to be in the record, presumably the bulk of Lift Line's budget continues to come from governmental sources, since by defendants' own account, the fares received from riders cover only a small fraction of Lift Line's costs. Riley states in his affidavit that it costs Lift Line $18.00 to provide each paratransit ride, and that "with fares being only $1.75 per ride, Lift Line loses over $16.00 each time it provides a ride to one of its customers." Riley Aff. ¶ 39.

Defendants, then, receive substantial government aid to assist them in operating a system that will provide paratransit services to the disabled. As beneficiaries of such aid,

---

**2.** Lift Line currently charges $1.75 per ride, although under the regulations it could charge as much as $5.50 depending on the points of origin and destination.

**3.** § 12203. Prohibition against retaliation and coercion

(a) **Retaliation.** No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) **Interference, coercion, or intimidation.** It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.
(c) **Remedies and procedures.** The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

which is provided to defendants for the specific purpose of helping to provide services to disabled members of the community, defendants have an obligation to the public in general, from whose tax dollars those funds originate, and to the disabled in particular, for whose benefit those funds are earmarked, to provide paratransit service to all eligible persons, including next-day service to all who request it.

Furthermore, plaintiffs are not asking for paratransit services to which they are legally not entitled. They seek only to require defendants to comply with their obligations under the ADA. If defendants wish to provide paratransit services to persons who do not meet the standards for eligibility under the ADA, they may certainly do so. Defendants cannot, however, use that generosity as an excuse for their failure to provide services to individuals who *do* qualify. *See Liberty Resources*, 155 F.Supp.2d at 258 ("While this Court applauds Septa's commitment to the elderly community [by providing rides to elderly non-ADA-eligible patrons], Septa may not rely on that commitment to excuse itself from its duties under the ADA").

Defendants also state that one of the biggest reasons for denied trip requests is that persons often reserve rides only to cancel at the last minute, or not show up at all. Riders also allegedly frequently "double-book," *i.e.*, make two or more reservations for different destinations at the same time, with the result that one or more reserved seats go empty. Defendants contend that these are circumstances outside of their control.

Section 37.131(f)(3)(ii) of the regulations states that "[o]perational problems attributable to causes beyond the control of the entity (including, but not limited to, weather or traffic conditions affecting all vehicular traffic that were not anticipated at the time a trip was scheduled) shall not be a basis for determining that such a pattern or practice [that significantly limits the availability of service to ADA paratransit eligible persons] exists." Assuming *arguendo* that this section, which by its terms relates to the pattern-or-practice provision in § 37.131(f)(3), also applies to the next-day service requirements of § 37.131(b), it does not excuse defendants' failure to comply with the latter section due to alleged no-shows, double-bookings, etc. Although the list of such causes in § 37.131(f)(3)(ii) is not exhaustive, the clear implication of that section is that it refers only to *operational* problems, *i.e.*, problems with the actual operation of vehicles that prevent or delay the completion of scheduled trips, such as bad weather and unexpected traffic conditions. Problems arising from no-shows and the like do not fall into that category.

Moreover, given the undisputed statistics showing that the percentage of ride requests that are granted drops precipitously over the course of the 14–day request period, it is hardly surprising that there are frequent cancellations, or that patrons double-book rides. Obviously, under the present system, riders realize that the farther in advance that they request a ride for a particular day, the greater the likelihood that their request will be granted.[4] Few persons, however, can reliably plan all their daily activities two weeks ahead of time. Consequently, the farther in advance patrons schedule their rides, the greater the likelihood that their plans will change during the interim as well. If defendants took the necessary steps to provide next-day service, it is likely that the incidence of cancellations, double-bookings, etc., would drop, as individuals would feel less pressure to make reservations far in advance. *See Liberty Resources*, 155 F.Supp.2d at 258 (stating that "[p]erhaps, if Septa rethought its current policy [of permitting rides to be scheduled up to seven days in advance], more ADA-eligible riders would be served").

In addition, as for no-shows, the regulations expressly permit the entity to "establish an administrative process to suspend, for a reasonable period of time, the provision of complementary paratransit service to ADA eligible individuals who establish a pattern or practice ,of missing scheduled trips." 49

---

4. Defendants' statistics show that over the period from May 26 to June 14, 2000, 74.4% of ride requests were made a full 14 days in advance. Defendants' Ex. 3.

C.F.R. § 37.125(h). Defendants have not done so.

With respect to cancellations, defendants' statistics indicate that typically about 17% of all rides requested have been cancelled by the riders. Riley Aff. ¶ 46. To contend that this excuses trip denials, however, boils down to simply another form of defendants' capacity-constraint argument. The fact that seats were set aside for those riders does not justify denying other ride requests, since defendants are obligated to "monitor current ADA complementary paratransit usage, acquire additional service based on projected demand, and maintain the ability to respond to surges in demand." Opinion Letter of FTA Chief Counsel Reilly at 2–3 (quoted in *Liberty Resources*, 155 F.Supp.2d at 256). Thus, even if *none* of those rides had been cancelled, defendants were still obligated to maintain the capacity to provide next-day service to any eligible individual who might request it.

I am not insensitive to the fact that defendants have certain financial and budgetary constraints, and that as a practical matter there will always be limits to the number of rides that Lift Line can provide on a given day. If it would in fact be impossible, however, due to monetary constraints or other reasons, for defendants at this point to ensure that Lift Line could fulfill 100% of next-day ride requests, the Act and the regulations provide for a waiver of the entity's obligations to provide paratransit service where compliance with the service criteria creates an undue financial burden on the entity. *See* 42 U.S.C. § 12143(c)(4); 49 C.F.R. § 37.151. Thus, if it is truly impossible for defendants at this point to meet all their obligations under the ADA and the regulations, they may seek relief under these provisions.

Defendants also argue that, if the court agrees with plaintiffs' interpretation of § 37.131(b), plaintiffs' motion for summary judgment should nonetheless be denied, because questions of fact exist as to whether the particular next-day ride denials alleged in the complaint actually occurred, and as to whether plaintiffs were actually entitled to paratransit service when they were allegedly denied rides, and hence whether they have standing to complaint about the denials.

■ I am not persuaded by these arguments. First, defendants have failed to file an affidavit showing that additional discovery is needed, as required by Rule 56(f). That failure itself constitutes sufficient grounds to reject a claim that discovery is needed to oppose a motion for summary judgment. *See Gurary v. Winehouse*, 190 F.3d 37, 43–44 (2d Cir.1999) ("the failure to file such an affidavit is fatal to [such] a claim ... even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law"); *accord Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir.1994).

■ Moreover, defendants do not deny that they have denied, and continue to deny, next-day ride requests because of a lack of capacity in their system. There is also no dispute that each of the plaintiffs has been certified by defendants as paratransit-eligible. Defendants' speculative suggestion that the alleged ride denials may not have occurred, or that plaintiffs may not have been eligible for the rides requested, is insufficient to show the existence of a genuine issue of material fact to defeat plaintiffs' motion.

### III. Waiting–List Claim

■ Plaintiffs' second claim for relief alleges that defendants limit the availability of paratransit service to eligible individuals by the use of waiting lists for such service. The use of waiting lists is prohibited by 49 C.F.R. § 37.131(f).

Defendants have moved for summary judgment on this claim as well. Plaintiffs have not cross-moved on this claim, but oppose defendants' motion on the ground that additional discovery is needed. In support of that assertion, plaintiffs have submitted an affidavit of their attorney setting forth the nature of the needed discovery in accordance with Fed.R.Civ.P. 56(f). In general, these facts relate to defendants' scheduling methods, such as their practice of requiring persons to call back to "confirm" the availability of a ride at the time requested, and whether

those practices amount to the use of a waiting list.

Defendants contend that the prohibition of waiting lists relates only to the use of waiting lists for *eligibility* for paratransit service, not to individual rides. In other words, defendants assert that the regulation proscribes public entities from maintaining waiting lists for persons seeking certification of paratransit eligibility. Defendants contend that the regulation does not prohibit them from requiring individuals to wait a day before receiving confirmation that a particular ride is available.

Defendants' interpretation of this regulation finds some support in the DOT's construction and interpretation of the regulations, contained at Appendix D to 49 C.F.R. Part 37. With respect to the prohibition of waiting lists, the DOT stated,

> Tyically, [sic] a waiting list involves a determination by a provider that it can provide service only to a given number of eligible persons. Other eligible persons are not able to receive service until one of the people being served moves away or otherwise no longer uses the service. Then the persons on the waiting list can move up. The process is analogous to the wait that persons in some cities have to endure to be able to buy season tickets to a sold-out slate of professional football games.

49 C.F.R. pt. 37, App. D, § 37.131 at 527 (2000).

Nonetheless, the DOT stated only that a waiting list "typically" involves such a scenario; it did not exclude the possibility that other practices, such as placing patrons on a waiting list for individual rides, might also be prohibited by this regulation. The regulation itself states only that the "entity shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals" by the use of "[w]aiting lists for access to the service . . . ." 49 C.F.R. § 37.131(f)(2). On its face, that language leaves it unclear whether "access to the service" refers only to initial eligibility determinations, or also to the granting of individual ride requests.

Given that ambiguity and the procedural posture of this case, I believe that the more prudent course is to allow this claim to go forward and permit the parties to conduct discovery regarding whether defendants do employ waiting lists for access to paratransit service, and if so, the precise nature of those lists and how they are utilized. I therefore deny defendants' motion for summary judgment on this claim, without prejudice to renewing the motion after a period of discovery.

## IV. Pattern–or–Practice Claim

■ Plaintiffs' third claim for relief alleges that by maintaining waiting lists for service, providing transportation only on a "first come, first served" basis, and failing to provide next-day service, defendants have engaged in an operational pattern or practice that significantly limits the availability of paratransit services to plaintiffs, in violation of 49 C.F.R. § 37.131(f)(3). Such patterns or practices include, but are not limited to: substantial numbers of significantly untimely pickups for initial or return trips; substantial numbers of trip denials or missed trips; and substantial numbers of trips with excessive trip lengths. *Id.*

Under the DOT's interpretation of this section, "a 'pattern or practice' involves[ ] regular, or repeated actions, not isolated, accidental, or singular incidents. A missed trip, late arrival, or trip denial now and then does not trigger this provision." 49 C.F.R. pt. 37, App. D, § 37.131 at 527 (2000). In his December 28, 1999 opinion letter, FTA General Counsel Reilly also stated that "the term 'substantial number' as used in section 37.131 cannot be read to allow a transit agency to make operational decisions to serve less than all eligible riders. The assumption of section 37.131 is that operational decisions designed to serve all eligible riders will lead to an insubstantial number of denials because of elements beyond the transit agency's control." Plaintiffs' Ex. B. By way of example, Reilly stated that an acceptable denial would be one made due to an act of God, such as poor weather that prevented a vehicle from picking up an eligible rider, but that "[a]n example of an unacceptable denial is if the

transit agency denied a trip to an eligible rider for lack of vehicles." *Id.*

In response to this claim, defendants contend that they do not engage in an unlawful pattern or practice in violation of the ADA because the number of trip denials during the period relevant to the complaint-about six percent-is not "substantial." Although both sides agree that the term "substantial" is not explicitly defined in the statute or regulations, I believe that the evidence is clear that, based upon the number of ride denials, particularly for next-day service, defendants have engaged in an operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons. This case does not present a situation in which a trip is denied "now and then." The evidence clearly shows that rides are regularly denied not because of matters outside defendants' control, but because of a lack of available seats, which in turn is attributable to defendants' insufficient capacity and its booking practices, as explained above. Even looking at the total number of denials over the course of the 14-day reservation period, the 6% of requests that are denied, or 510 out of 8962 requests from May 26 to June 14, 2000, cannot reasonably be considered "insubstantial." *See Liberty Resources,* 155 F.Supp.2d at 256 ("The focus is not on the percentage of rides that Septa does provide to the disabled, but rather, the number of rides that Septa fails to provide to these patrons and the reasons for that failure"; concluding that 2.8% denial rate resulted in "substantial" number of denials).

## V. Failure to Provide Service in Accordance with Defendants' Plan

■ Plaintiffs' fourth claim for relief alleges that defendants have failed to provide paratransit services in accordance with their plan submitted to the Secretary pursuant to 42 U.S.C. § 12143(c)(7). Defendants contend that this claim should be dismissed because it is factually derivative of plaintiffs' other claims, which defendants contend are meritless.

Under § 12143(e)(4), prohibited "discrimination" includes "a failure of [a public] entity [to whom the Act applies] to provide para-

transit or other special transportation services in accordance with the plan or modified plan the public entity submitted to the Secretary under this section." Thus, a failure to provide services in accordance with the submitted plan itself constitutes a violation of the ADA. Since I have found that plaintiffs are entitled to summary judgment on their first and third claims for relief, I will grant summary judgment in their favor on this claim as well.

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs have also moved for an order conditionally certifying this as a class action under Rule 23 of the Federal Rules of Civil Procedure. The proposed class is defined as all persons who are now or in the future will be eligible for ADA paratransit services in the geographical area served by defendants.

In response, defendants have cross-moved for an order staying any decision on the issue of class certification pending discovery. Defendants contend that discovery is necessary to determine whether plaintiffs adequately meet the commonality and typicality requirements of Rule 23(a). Defendants contend that prior to the court certifying the class, defendants should be given the opportunity to conduct discovery of the named plaintiffs regarding the adequacy of their representation.

In order to be certified a class action, a lawsuit must satisfy the prerequisites of Fed. R. Civ. Proc. 23(a) and one of the categories of Rule 23(b). Rule 23(a) provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, subdivision (b)(2) of Rule 23, pursuant to which plaintiffs here seek class status, allows certification if "the party op-

posing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

In seeking to certify a class action, the plaintiff bears the burden of establishing that the action satisfies these requirements. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 561 (2d Cir.1968), *vacated and remanded on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). In deciding whether to grant class certification, the court must assume the truth of the factual assertions contained in the complaint. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield,* 938 F.Supp. 1131, 1139 (E.D.N.Y. 1996).

Rule 23(c)(1) requires the district court to determine whether to certify a case as a class action "[a]s soon as practicable after the commencement of [the] action." "The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation." *Jones v. CCH–LIS Legal Information Servs.,* No. 97 Civ. 4372, 1998 WL 671446 at *1 (S.D.N.Y. Sept.28, 1998) (citing *Korn v. Franchard Corp.,* 456 F.2d 1206, 1208–09 (2d Cir.1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298, 301 (2d Cir.1968)).

After reviewing the complaint and the arguments presented by both sides, I believe that conditional certification is proper at this point. There appears to be no dispute that the named plaintiffs have been certified as eligible for paratransit service provided by Lift Line, and defendant concedes that it has denied, and continues to deny, requests for next-day service due to capacity constraints. Assuming the truth of plaintiffs' factual allegations regarding the occasions on which they have been denied next-day service, I find that they meet the requirements of Rules 23(a) and 23(b)(2), and I am not persuaded by defendants' contentions regarding the alleged possible inadequacies of plaintiffs' representation of the class.

I also note that, if at some point it appears that the requirements of Rule 23 are not in fact met, the court has the power to decertify the class. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). The court need not do so, however, simply because it later appears that the named plaintiffs were not class members or were otherwise inappropriate class representatives. "Rather, the Supreme Court has stated, 'provided the initial certification was proper ... the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims." *Id.* (quoting *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)).

## CONCLUSION

Defendants' motion for summary judgment (Docket Item 4) is denied. Plaintiffs' cross-motion for partial summary judgment (Docket Item 10) is granted, and the Clerk of the Court is directed to enter judgment in favor of plaintiffs on their first, third, and fourth claims for relief.

The court hereby declares that defendants have violated plaintiffs' rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* by: failing to provide next-day service to all ADA paratransit-eligible persons as required by 49 C.F.R. § 37.131(b); engaging in an operational pattern or practice that significantly limits the availability of paratransit services to plaintiffs, in violation of 49 C.F.R. § 37.131(f)(3); and failing to provide paratransit or other special transportation services in accordance with the plan that defendants submitted to the Secretary of Transportation under 42 U.S.C. § 12143(c)(7), in violation of 42 U.S.C. § 12143(e)(4).

Defendants are hereby ordered to take immediate steps to comply with their obligations under the ADA and federal regulations implementing that Act, and to implement the directives contained in this Decision and Order, specifically with regard to the provision of next-day paratransit service.

The parties are directed to attempt to work together to formulate a comprehensive plan to effectuate this Decision and Order. If they are unable to agree on a mutually satisfactory plan, then plaintiffs are to submit the outlines of a proposed plan to the court within thirty (30) days of the date of entry of this Decision and Order.

Plaintiffs' motion for conditional class certification (Docket Item 15) is granted. The class is hereby defined as all persons who are now or in the future will be eligible for ADA paratransit services in the geographical area served by defendants.

Defendants' cross-motion to stay any decision on plaintiffs' motion for class certification (Docket Item 19) is denied.

IT IS SO ORDERED.